UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| GERALD LESSERT, Special Administrator of the Estate of RICHARD CLAYMORE LESSERT, Deceased; and RICHARD CLAYMORE LESSERT,<br><br>             Plaintiffs,<br><br>    vs.<br><br>BNSF RAILWAY COMPANY, a Corporation,<br><br>             Defendant. | CIV. 17-5030-JLV<br><br>ORDER |

## INTRODUCTION

A train operated by defendant BNSF Railway Company struck and killed Richard Lessert on January 17, 2017, near Edgemont, South Dakota.[1]   Plaintiff Gerald Lessert, as the special administrator of Mr. Lessert's estate and on behalf of his surviving family, brings this action under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, asserting defendant negligently caused Mr. Lessert's death.   (Docket 1).   Now pending before the court are the parties' four motions for summary judgment on issues of negligence and defendant's motion to exclude certain expert testimony.   (Dockets 47, 108, 112, 115 & 129).   The court also ordered the parties to brief whether the cause of Mr. Lessert's death can be determined on summary judgment.   (Dockets 181, 186 & 187).

---

[1]Plaintiff objects to describing the site of the incident as "near" Edgemont because "it is undefined[,]" but his own complaint alleges the incident occurred "at or near Edgemont[.]"   (Dockets 1 at ¶ 5 & 138 at ¶ 1).

The court referred this case to United States Magistrate Judge Daneta Wollmann for resolution of pretrial motions pursuant 28 U.S.C. § 636(b)(1) and its standing order of April 2, 2018.   (Docket 121).   The magistrate judge concluded in a report and recommendation ("R&R") that defendant violated 49 C.F.R. § 214.315 by failing to brief Mr. Lessert and his crew on safety measures when it assigned them to work on a track and was thus negligent per se.   (Docket 179).   She further concluded in a separate order that four of plaintiff's experts should be excluded because their opinions only concerned negligence—which would be irrelevant if defendant were negligent per se—but that plaintiff's damages expert should be permitted to testify.   (Docket 184). Defendant objects to the R&R and the order.   (Dockets 185 & 189).   Plaintiff responded to defendant's objections but did not file any objections of his own.

The Federal Magistrate Act provides two separate standards of review. For most pretrial matters, such as a motion to exclude expert opinions, the court "may reconsider" the magistrate judge's order "where it has been shown that the . . . order is clearly erroneous or contrary to law."   28 U.S.C. § 636(b)(1)(A).   For dispositive matters, including motions for summary judgment, the court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. at § 636(b)(1).   The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."   Id.

For the reasons given below, the court overrules defendant's objections to the magistrate judge's R&R on negligence in part and sustains them in part.

2

The court finds defendant violated § 214.315 and was negligent per se.   The court further concludes genuine disputes of material fact prevent determining the issue of causation on summary judgment.   The court then largely affirms the magistrate judge's order permitting plaintiff's damages expert to testify. Finally, the court adopts the magistrate judge's R&R—to which no party objected—concerning certain proposed damages.   (Docket 180).

## I.   Facts

The following factual recitation is drawn from the voluminous record the parties submitted.[2]   Where disputed, the court views facts in the light most favorable to the nonmoving party with respect to an individual issue.[3] Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); see also Thompson-Harbach v. USAA Fed. Sav. Bank, 359 F. Supp. 3d 606, 614 (N.D. Iowa 2019) ("Where a court confronts cross motions for summary judgment, the court views the record in the light most favorable to plaintiff when

---

[2]The National Transportation Safety Board investigated the incident at issue in this case and authored a report which made factual findings.   Docket 90-4; see also BNSF Railway Roadway Worker Fatalities, Edgemont, S.D., Jan. 17, 2017, available at https://www.ntsb.gov/investigations/AccidentReports/ Pages/RAR1801.aspx.   However, "[n]o part" of an NTSB report "may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report."   49 U.S.C. § 1154(b).   The court accordingly does not rely on the NTSB report in making these factual findings.

[3]The magistrate judge applied an incorrect standard when she declined to draw inferences in favor of any party because of the cross-motions.   (Docket 179 at p. 2 n.1).   Because the court applies the correct standard in its de novo review, the error was harmless.   See infra Section II.C.

considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion.").

On January 17, 2017, Mr. Lessert, Doug Schmitz and Stanley Mitchell were all BNSF maintenance of way workers.   (Dockets 49 at ¶ 9 & 110 at ¶¶ 6-8). As the name suggests, maintenance of way workers are responsible for maintaining the railway track for train use, including by cleaning snow and ice out of the tracks.[4]   (Docket 173-9 at p. 7).   For federal regulatory purposes, the three men were "roadway workers."   (Docket 110 at ¶¶ 9-11).   Mr. Lessert was the foreman of the three-person maintenance of way crew.   (Docket 131 at ¶ 20).

BNSF intended to move a train from a main track onto the Deadwood wye on January 17 to facilitate testing of train communication equipment.   (Docket 117 at ¶ 3).   A wye is an intersection of three tracks used to turn or store trains. The third leg of the Deadwood wye—the portion of the wye separate from the main track forming the other two legs—was often used to park railcars.[5] (Docket 49 at ¶ 2).   Trains are directed from the main track onto the third leg of

---

[4]Cleaning tracks is not solely the responsibility of maintenance of way. Train crews are also responsible for cleaning snow and ice when necessary. (Docket 173-9 at pp. 7-8).

[5]Plaintiff objects to "the connotation" that, because railcars were often parked on the wye, snow and ice could not accumulate on the track, but does not dispute defendant's asserted fact.   (Docket 174 at ¶ 2).

the wye using a device called a switch.   (Docket 117 at ¶ 2).   Snow and ice can obstruct a switch and impede its use.[6]   Id. at ¶ 3.

Dennis Stirmel was the "foreman in charge" on January 17 for the Edgemont region.   (Docket 153-1 at pp. 3-4).   He was "in charge of lining out duties[.]"   Id. at p. 4.   In his deposition, Mr. Stirmel testified he was "[d]elegating the duties that were assigned that day to all the work groups" and "letting them know what the plan was."   Id. at p. 5.

However, Mr. Stirmel's ordinary job was as a track inspector.   Id. at p. 2. Chuck Oleson was the roadmaster for the region.   (Docket 173-22 at p. 3).   He ordinarily would have "delegate[d] things that [were] going on" and held a morning planning call.   Id. at p. 5.   Mr. Oleson was in Scottsbluff, Nebraska, on January 17, leading to Mr. Stirmel's role as foreman in charge.   Id. at p. 3.   On January 16, Mr. Oleson had told Mr. Stirmel "they were going to be pulling those cars out of the Deadwood wye, and to make sure to have Edgemont up there and work with the trainmaster."   Id. at p. 7.   Mr. Lessert's crew—operating out of Edgemont—was responsible for cleaning switches in the area.   Id.

---

[6]Plaintiff asserts "[i]t is not logically possible for a switch to be both obstructed and to function properly" and argues whether a switch encrusted with ice and snow requires maintenance is a material factual dispute for trial. (Docket 138 at ¶ 10).   Because the court finds defendant was negligent per se on other grounds, see infra Section II.D.4, this dispute is not material.

At 7:30 a.m., Mr. Stirmel had a phone call with Mr. Lessert and his work crew.[7]  Id. at p. 6.   He described the purpose of the call as "to make sure [the crew] were aware" about the use of the Deadwood wye and "to have them . . . communicate with the trainmaster to find out just exactly what kind of help from maintenance of way that they were going to need."  Id.  Mr. Stirmel knew there were train cars in the wye that "had been in there for a quite a while[,]" which led him to conclude that the switch "had not been thrown or cleaned since first snowfall[.]"  Id. at p. 7.   However, Mr. Stirmel did not know the details for the use of the wye—"which direction the train was coming in, which direction the train was going out," etc.—so he directed Mr. Lessert to contact the trainmaster "to figure out what needed to be done."  Id. at pp. 7-8.   Mr. Lessert's crew confirmed to Mr. Stirmel "they would get ahold of Jim Korecky, trainmaster, and find out what needed to be done."  Id. at p. 8.

Rodney Huber, a track inspector, was also on the call.  Id.  Mr. Huber testified they discussed "that the trainmaster and the road foreman needed somebody to come clean the Deadwood wye switch[.]"  (Docket 153-9 at p. 5). They did not discuss who would clean the switch.  Id. at p. 6.   It was assumed Mr. Lessert and his crew would clean the switch because they were responsible for that section of track.  Id. at pp. 6-7.   Mr. Stirmel agreed with Mr. Huber's description of the call as "assign[ing]" the task of "clean[ing] snow and ice out of the wye switch" to Mr. Lessert's crew.   (Docket 173-22 at p. 6).

---

[7]Mr. Stirmel agreed with plaintiff's counsel's description of the call as "assign[ing] [Mr. Lessert's] crew to clean out the wye switch[.]"   (Docket 173-22 at pp. 8-9).

Mr. Stirmel did not conduct a safety briefing during the 7:30 a.m. call.

(Docket 173-22 at pp. 8-9).   He did not discuss

> the means by which the maintenance of way crew would have
> on-track protection[,]   .   .   .   anything about on-track safety
> procedures[,] . . . anything about movements on adjacent track . . .
> [or] anything about the nature of the work to be performed or the
> characteristics of the location there where they would be cleaning
> snow and ice out of the[] switches[.]

Id.   Nor did Mr. Stirmel designate a roadway worker in charge for Mr. Lessert's

crew, although he was aware each of the three crew members were qualified for

the position.   Id. at p. 9.   Mr. Stirmel did not consider the 7:30 a.m. call a job

safety briefing.   Id.   He referred to it as a "job task briefing[,]" which he

described as "merely a way of [him] communicating with another work group as

to the work that needed to be done."   Id. at pp. 9-10.

Mr. Stirmel testified he could not conduct a job safety briefing correctly

without personally assessing conditions on site.   Id. at p. 10.   He was located in

Newcastle, Wyoming, during the morning call, approximately 60 miles from

Edgemont.   Id.   He believed "the foreman or employee in charge" was

responsible for assessing safety conditions "when they get to that job location."

Id.   The crew would have then had the job safety briefing "on location when they

found out what they needed to do."   Id. at p. 11.

The trainmaster was James Korecky.   (Docket 173-9 at p. 4).   Mr.

Korecky was working to move railcars off of the Deadwood wye on January 17.

Id. at pp. 4-5.   Mr. Korecky and Shad Sowers, a BNSF foreman, were checking

crossings—where roads cross the railway tracks—around the wye.   (Docket

7

149-5 at p. 3).   One particular crossing was frozen solid.   Id.   Mr. Korecky and Mr. Sowers "contacted maintenance of way" to advise they "need[ed] some help on this crossing[.]"   Id.   Mr. Korecky was also concerned about the state of the switch at issue here.[8]   (Docket 188-2 at pp. 2-3).   It was "iced in."   (Docket 50-4 at p. 4).   Randy Dixon, a brakeman, had worked for 30 to 40 minutes to clean the switch of ice and snow and render it operable earlier that morning.   Id. at p. 3.   There had been "a few freeze and thaw cycles" leading up to January 17, meaning that snow had melted and refrozen into ice on the switch.   (Docket 173-9 at p. 10).   This made cleaning the switch more difficult.   Id.

The maintenance of way crew arrived at the crossing while Mr. Korecky was there.   (Docket 188-2 at p. 2).   He did not know the crew's "assigned responsibility" but recalled giving Mr. Lessert "a briefing, a rundown on what [they] were doing, what [they] were out there to accomplish that day."   Id.   Mr. Korecky did know the crew "had come out to assist [them]" with "issues [they'd] been having" with blocked crossings and switches.   Id.   It was not Mr. Korecky's intention to direct the maintenance of way crew to clean the switch, but he did "point[] out a problem, and [the crew] said they were going to take a look at it[.]"   Id. at p. 3.   In his view, "cleaning ice out of switches" was "standard work[.]"   Id.   He viewed telling the maintenance of way crew about the switch as "a matter of killing the time until the front end loader could show

---

[8]Defendant asserts Mr. Korecky was primarily concerned with "clearing grade crossings (not switches)[.]"   (Docket 185 at p. 4) (emphasis in original). This contention ignores Mr. Korecky's testimony about the frozen switch.   See Docket 188-2 at pp. 2-3 (discussing difficulty of clearing switch).

8

up out there because [they] realized what [they] were doing with shovels was a waste of time if [they] were going to have heavy power equipment there shortly, so it was just conversation."   Id.

Although Mr. Mitchell was part of the same work crew as Mr. Lessert and Mr. Schmitz, he was not physically present with both of them during the entire morning of January 17.   (Docket 139-7 at pp. 10-11).   He was transporting a front end loader to the job site.   Id.   In total, he was outside the presence of Mr. Lessert and Mr. Schmitz for about an hour and a half that morning.   Id.   Mr. Mitchell does not know what Mr. Lessert and Mr. Schmitz discussed during that time period, including whether they discussed safety measures or communicated with a BNSF dispatcher.   Id. at pp. 10-11.

According to Mr. Sowers, the three members of the work crew conducted "their maintenance of way briefing" when Mr. Mitchell arrived with the loader. (Docket 149-5 at p. 3).   Mr. Mitchell testified that the crew talked in a pickup truck.   (Docket 50-6 at pp. 3-4).   They agreed to use a lookout as their on-track protection, concluding the method was "appropriate, adequate, and safe" given the distance they were able to see down the tracks (the "sight distance"). (Docket 139-7 at p. 3).   No one on the crew called the dispatcher to request "exclusive track authority" or "track and time"—methods by which the dispatcher can halt all train traffic on the section of track occupied by workers. Id.; see also Docket 49 at ¶ 25.   Mr. Mitchell did not expect that cleaning the switch would take more than four or five minutes.   (Docket 139-7 at p. 2).

Mr. Mitchell testified that Mr. Lessert was the foreman of the crew.   Id. He agreed with defense counsel that Mr. Lessert, "as the foreman, was technically the employee in charge" of the crew, "the same thing as a road worker in charge[.]"   Id. at p. 6.   Mr. Lessert did not state "in the form of a briefing" that the crew would use a lookout for on-track safety.   Id.   He did not "provide a briefing . . . on where the lookout needed to be positioned or . . . where [the crew] needed to go in the event that [they] needed to exit the tracks."   (Docket 188-3 at p. 7).   Nor did he designate any crew member as a lookout in Mr. Mitchell's presence.   (Docket 139-7 at p. 6).

However, Mr. Schmitz completed an on-track safety form identifying himself as the lookout.   Id.; see also Docket 111-2 (completed form).   On the form, Mr. Schmitz identified the "place of safety"—where "employees . . . can go when a train approaches"—as the truck.   Id.   He also wrote he would give a verbal warning to other crew members about an approaching train.   Id.   Mr. Schmitz stated he would not do any work on the switch while acting as a lookout, but also told the crew they would "take turns."   (Dockets 139-7 at p. 6 & 188-3 at p. 7).   The crew never rotated the lookout duty.   (Docket 139-7 at p. 12). Mr. Mitchell saw Mr. Schmitz carry a shovel to the switch.[9]   Id. at p. 6.   Mr. Lessert was carrying a blower.   Id.

BNSF engineer Tyler Bilbruck was operating a train on the main track. (Docket 49 at ¶ 10).   When his train came around a corner, he saw "the tail end

---

[9]Plaintiff disputes the implication that Mr. Schmitz "was engaged in work other than his lookout duties."   (Docket 138 at ¶ 31).

10

of a maintenance truck" and "two gentlemen in the middle of the track[.]" (Docket 50-1 at p. 5).   One of the men had "a backpack leaf blower."   Id. at p. 8. Mr. Bilbruck did not see a third man.   Id.   A still shot taken from train video footage shows two men on the tracks and a third a short distance away.   (Docket 50-14).   The train struck and killed Mr. Lessert and Mr. Schmitz.   (Docket 49 at ¶ 10).   Mr. Mitchell survived.   Id.

## II.   Negligence & Causation

### A.   Legal Standards

#### 1.   Summary judgment

Under Federal Rule of Civil Procedure 56(a), a movant is entitled to summary judgment if the movant can "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact exists.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).   Only disputes over facts which might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Id. at 248.   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

11

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate.   Id.   However, the moving party is entitled to judgment as a matter of law if the nonmoving party failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   Id. at 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party.   Matsushita, 475 U.S. at 587-88 (1986).   The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Anderson, 477 U.S. at 251-52.

## 2.   FELA

"Under FELA, conduct is deemed negligent per se if it violates a statute or regulation and if it 'contributes in fact to the death or injury in suit, without regard to whether the injury flowing from the breach was the injury the statute sought to prevent.' "   Morant v. Long Island R.R., 66 F.3d 518, 523 (2d Cir. 1995) (quoting Kernan v. Am. Dredging Co., 355 U.S. 426, 433 (1958)).   "Under a negligence per se theory, if a plaintiff proves . . . a statutory violation . . . he need not prove the traditional negligence elements of foreseeability, duty and

breach, but he is still required to prove causation." Cowden v. BNSF Ry. Co., 975 F. Supp. 2d 1005, 1026 (E.D. Mo. 2013) (internal quotation omitted).   "[A] defendant railroad caused or contributed to a railroad worker's injury if the railroad's negligence played a part—no matter how small—in bringing about the injury." CSX Transp., Inc. v. McBride, 564 U.S. 685, 705 (2011) (internal quotations omitted).   However, "[i]f the plaintiff's negligence was the *sole* cause, then the [regulatory] violation . . . could not have contributed in whole or in part to the injury." Beimert v. Burlington N., Inc., 726 F.2d 412, 414 (8th Cir. 1984) (emphasis in original).

### B.   Defendant's Objections

Defendant raises four factual and four legal objections to the R&R.   As summarized and reordered by the court, the factual objections assert:

1.   Defendant did not assign Mr. Lessert and his crew to foul a track on the morning of January 17.   (Docket 185 at pp. 16-18).

2.   Mr. Lessert was the roadway worker in charge during the incident.   Id. at pp. 20-24.

3.   Mr. Stirmel was not "higher in the chain of command than Mr. Lessert." Id. at pp. 24-26.

4.   Mr. Schmitz was not the lookout during the incident.   Id. at pp. 26-28.

13

The legal objections argue:

1.   49 C.F.R. § 214.315 does not require a railroad to conduct a safety briefing when an employee is assigned to foul a track.[10] <u>Id.</u> at pp. 8-14.

2.   Section 214.315 does not require separate safety briefings at the time an employee is assigned to foul a track and when the employee is on site at the track.   <u>Id.</u> at pp. 14-15.

3.   Mr. Lessert was required to provide the § 214.315 safety briefing.   <u>Id.</u> at pp. 18-20.

4.   Defendant did not violate § 214.315 by failing to give a safety briefing during a conference call on the morning of January 17.   <u>Id.</u> at pp. 15-16.

The court evaluates each objection in turn.

## C.   Factual objections

### 1.   Assignment of Mr. Lessert and crew

The magistrate judge found that Mr. Stirmel assigned Mr. Lessert and his work crew to foul a track by cleaning the Deadwood wye switch during the 7:30 a.m. call.   (Docket 179 at pp. 4-6).   Defendant objects to this finding, arguing that Mr. Stirmel was "merely relaying a message from the trainmaster, Mr. Korecky, to inform crews of the situation and expectations for the day."   (Docket 185 at p. 16).   It asserts "Mr. Lessert was asked to assist clearing a crossing that morning, not a switch, and that [he] alone decided to have his crew clear the Deadwood wye switch."   <u>Id.</u> at p. 17.   Viewing the evidence in the light most favorable to defendant, the court overrules the objection.   No reasonable jury

---

[10]Fouling a track is railroad terminology for occupying it.   Federal regulations define fouling track as "the placement of an individual . . . in such proximity to a track that the individual . . . could be struck by a moving train[.]" 49 C.F.R. § 214.7.

could conclude anything other than that Mr. Stirmel assigned Mr. Lessert to clean the Deadwood wye switch.

The question of when Mr. Lessert was assigned to foul a track is material because § 214.315 requires a railroad to conduct a safety briefing when it "assigns a duty to a roadway worker that calls for that employee to foul a track[.]" 49 C.F.R. § 214.315(a); see also infra Section II.D.1.   "Assign" is not defined in the regulations, so the court gives the word its "ordinary, contemporary, common meaning[.]"   Hennepin Cty. v. Fed. Nat. Morg. Ass'n., 742 F.3d 818, 821 (8th Cir. 2014) (internal quotation omitted).   Merriam-Webster defines assign, as relevant here, as "to appoint to a post or duty" or "to appoint as a duty or task[.]" Assign, Merriam-Webster.com Dictionary.[11]   Defendant does not offer an alternative definition.

On January 16, Mr. Oleson instructed Mr. Stirmel "to make sure to have [Mr. Lessert's crew] up there [at the Deadwood wye] and work with the trainmaster."   (Docket 173-22 at p. 7).   Mr. Stirmel described his role on January 17 as "lining out" duties or "delegating the duties that were assigned" to the various work crews, including Mr. Lessert's.   (Docket 153-1 at pp. 4-5). He also testified he considered the 7:30 a.m. call to be a "job task briefing[.]" (Docket 173-22 at p. 9).   During the call, Mr. Stirmel informed Mr. Lessert about the work taking place at the Deadwood wye and instructed him to contact the trainmaster for details about what help was needed at the wye.   Mr. Huber, the

---

[11]Available at https://www.merriam-webster.com/dictionary/assign (last visited July 16, 2020).

only other surviving participant in the 7:30 call, understood Mr. Stirmel to be directing Mr. Lessert's crew to clean the Deadwood wye.   Mr. Korecky understood that Mr. Lessert's crew had come out to the wye to assist with cleaning crosses and switches.   In fact, Mr. Sowers testified that he and Mr. Korecky had asked for a maintenance of way crew to be assigned to assist with clearing ice and snow.

This testimony leaves no genuine dispute that Mr. Stirmel assigned Mr. Lessert and his crew to work on the Deadwood wye on the morning of January 17.   Every participant in the morning's work at the wye understood that Mr. Lessert was assigned to assist with cleaning crosses and switches.   Mr. Oleson, the roadmaster in charge, specifically directed Mr. Stirmel to assign Mr. Lessert's crew to work at the Deadwood wye in his absence.   Mr. Stirmel himself considered the call a job task briefing—an obvious description of assigning workers to complete a job.   And, of course, Mr. Lessert and his crew reported to the Deadwood wye to clean it.

Defendant's arguments against this straightforward testimony are unpersuasive.   It first attempts to characterize Mr. Stirmel's "role [as] not one of giving assignments but [as] one of disseminating general information about what was going on that day."   (Docket 185 at p. 16).   It is true, as defendant points out, that Mr. Stirmel did not know specifics of how the work at the Deadwood wye would unfold.   But the record establishes beyond a doubt that he intended Mr. Lessert to report to the Deadwood wye to clean track.   That Mr. Stirmel did not intend to direct how Mr. Lessert cleaned the track does not mean he did not

16

assign him to clean the track.   Moreover, defendant's characterization belies Mr. Stirmel's own testimony that the 7:30 a.m. call was a job task briefing to discuss needed work at the Deadwood wye.

To the extent defendant argues Mr. Stirmel was merely relaying previously made assignments, see Docket 185 at p. 25, this argument ignores the transitive nature of the verb "assign."   A task cannot be assigned unless the assignee knows he or she has been instructed to accomplish it.   Even though Mr. Oleson directed Mr. Stirmel to assign the duty to Mr. Lessert and his crew before the morning call, no English speaker would say the task had been "assigned" while only Mr. Oleson and Mr. Stirmel knew about it.   It does not matter that Mr. Stirmel was relaying an assignment decision already made by Mr. Oleson.   The task was assigned when Mr. Lessert learned about it during the morning call.

Defendant next argues Mr. Lessert "was asked"—by whom, one might wonder—to clean a crossing, not a switch.   (Docket 185 at p. 17).   In defendant's view, Mr. Lessert "alone decided to have his crew clear the Deadwood wye switch."   Id.   Mr. Stirmel, acting on the direction of Mr. Oleson, assigned Mr. Lessert to assist in preparing the Deadwood wye for use.   And once Mr. Lessert arrived at the crossing, Mr. Korecky brought the problem with the frozen switch to Mr. Lessert's attention.   Mr. Stirmel had intended that Mr. Lessert receive further direction on his assignment on site, which is precisely what happened.   The assignment necessarily encompassed ensuring the switch was functional, in addition to any frozen crossings.

17

Defendant's attempt to parse the assignment into granular components has little support in the record.   Nor does it make sense—what use would it have been to assign the maintenance of way crew to clear a single crossing, when the Deadwood wye switch, an integral component of the wye, may have been encrusted with ice and snow?   In any event, as discussed below, see infra Section II.D.1, the § 214.315 safety briefing is required when an employee is assigned to foul a track—not when an employee is assigned to clean a switch.   It is immaterial whether Mr. Lessert was assigned to clean a crossing or a switch because cleaning either requires fouling a track.

The court finds there is no genuine dispute that Mr. Stirmel assigned Mr. Lessert and his crew to clean the Deadwood wye switch.   Defendant's objection is overruled.

### 2.    Roadway worker in charge

Although she noted the parties' extensive dispute over whether Mr. Lessert was the roadway worker in charge for purposes of § 214.315, the magistrate judge did not determine who was the roadway worker in charge.   (Docket 179 at pp. 3-4, 9 n.9 & 15 n.11).   She concluded that resolving the dispute was unnecessary.   Id. at p. 15.   Defendant objects, arguing that the record shows no genuine dispute that Mr. Lessert was the roadway worker in charge.   (Docket 185 at pp. 20-24).

Like the magistrate judge, the court declines to settle this immaterial dispute.   As discussed below, see infra Section II.D.4, the court concludes defendant was negligent per se by virtue of failing to provide a safety briefing

18

during the 7:30 a.m. call at which Mr. Stirmel assigned Mr. Lessert to foul a track.   This finding does not depend on the identity of the roadway worker in charge.   Hence, because the roadway worker in charge dispute does not "affect the outcome of the lawsuit[,]" it is not material.   <u>Williams v. Medalist Golf, Inc.</u>, 910 F.3d 1041, 1045 (8th Cir. 2018).

Defendant's objection is overruled.

### 3.   Chain of command

The magistrate judge noted Mr. Stirmel was above Mr. Lessert in the "chain of command" as part of her analysis finding he assigned the maintenance of way crew to foul a track.   (Docket 179 at p. 16).   Defendant objects both to the relevance of information concerning an employee's place in a chain of command in determining when a job assignment is made and to the factual conclusion that Mr. Stirmel was above Mr. Lessert in BNSF's chain of command. (Docket 185 at pp. 24-26).   Because the magistrate judge established this fact on summary judgment as part of accepting plaintiff's assignment argument, the court views the record on this point in the light most favorable to defendant, the non-moving party.   The court sustains the objection in part and overrules it in part.

First, the court rejects defendant's argument that the chain of command is irrelevant in determining when a job assignment has been made.   Defendant contends "[t]here is no language in the regulation or any guidance indicating that briefings must be given by one employee who is higher in the chain of command to another who is lower."   <u>Id.</u> at p. 25.   But the question of who must give a

briefing does not answer the distinct question of who has the power to assign a job.   The power to assign implies superiority.   In determining when a job assignment has been made, whether the purported assigner is superior in rank to the assignee is not necessarily dispositive, but it may well be a relevant factor.

However, the court agrees with defendant that the record does not establish beyond a genuine dispute that Mr. Stirmel was Mr. Lessert's superior. Mr. Stirmel agreed at his deposition that Mr. Lessert was "below [him] in the organizational flowchart *that day*."   (Docket 153-1 at p. 6) (emphasis added). Defendant attempts to discredit this testimony as given in response to a leading question, which the court finds unpersuasive.   (Docket 185 at p. 26 n.5).   But given that Mr. Stirmel was filling in for Mr. Oleson on January 17, the court cannot conclude that he was ordinarily Mr. Lessert's superior.   Defendant cites the testimony of its expert, John Bainter, that Mr. Stirmel and Mr. Lessert were both under the authority of Mr. Oleson, the roadmaster.   (Docket 188-4 at p. 2). The record thus establishes a few possibilities: Mr. Stirmel and Mr. Lessert may ordinarily have been at the same organizational level; Mr. Stirmel may have been Mr. Lessert's superior for the day only due to Mr. Oleson's absence; or Mr. Stirmel and Mr. Lessert may ordinarily have been at different organizational levels in a manner not disclosed to the court.   Because the court cannot say which of these options is correct, summary judgment as to Mr. Stirmel's position in the BNSF hierarchy vis a vis Mr. Lessert is not appropriate.

The court overrules defendant's objection in part and sustains it in part. The R&R is modified to conform with the court's findings.   However, this finding

does not affect the court's earlier conclusion that Mr. Stirmel assigned Mr.
Lessert and his crew to foul a track.   See supra Section II.C.1.

### 4.   Lookout

The magistrate judge found that Mr. Schmitz was the lookout during the
work on the Deadwood wye switch.   (Docket 179 at pp. 8-10).   Defendant
objects, arguing Mr. Lessert failed to designate a lookout.   (Docket 185 at
pp. 26-28).   The court, viewing the record on this matter in the light most
favorable to defendant, overrules the objection.

Mr. Mitchell testified that Mr. Schmitz was the lookout.   (Docket 139-7 at
p. 10).   He also expressly denied that Mr. Lessert was the lookout.   Id. at p. 12
("[Mr. Lessert] was not the lookout; he had the blower.").   More importantly, Mr.
Schmitz identified himself as the lookout in a form completed at the time when
the lookout decision was made.   (Docket 111-2).   Mr. Schmitz wrote his name
in the space labeled "Name of Lone Worker/Lookout."   Id.   At bottom, the
form—the only piece of documentary evidence—and the testimony of the sole
surviving witness agree Mr. Schmitz was the lookout.   Defendant has no
substantial evidence to the contrary.

Defendant first points to Mr. Mitchell's testimony that he did not hear Mr.
Lessert designate Mr. Schmitz to be the lookout.   (Docket 185 at pp. 26-27).
Simply because Mr. Mitchell did not hear Mr. Lessert designate Mr. Schmitz as
the lookout, however, does not mean it did not happen.   Mr. Schmitz evidently

considered himself to have been so designated when he completed the lookout form.[12]

Defendant next relies on testimony from Donna Behrens, the coroner who reported to the incident scene, that Mr. Mitchell initially identified Mr. Lessert as the lookout.   Id. at p. 27.   This incident was Ms. Behrens' first.   (Docket 188-9 at p. 2).   She described herself as "[un]familiar with railroad components."   Id. On scene, Ms. Behrens spoke to Mr. Mitchell before she "gathered . . . the bodies."   Id.   Mr. Mitchell "appeared to be in shock."   Id.   However, he "said that Mr. Lessert was the lookout, and that was about it."   Mr. Mitchell denied Ms. Behrens' account during his deposition.   (Docket 139-7 at pp. 7 & 12) ("I don't believe I told her that[.]").

If this were simply a matter of conflicting deposition testimony, the court would submit the question of who served as lookout to the jury.   But the lookout form Mr. Schmitz completed is dispositive.   Mr. Schmitz identified himself as the lookout on the form mere minutes before the incident.[13]   And there is ample reason to doubt Ms. Behrens' testimony.   This was her first incident as a coroner, and she was unfamiliar with the railroad.   Mr. Mitchell—who had just sustained the traumatic loss of two coworkers—was in shock.   No reasonable

---

[12]Defendant's reliance on regulations and internal rules requiring all members of a maintenance of way crew to be informed of the designation of a lookout is misplaced.   (Docket 185 at pp. 26-27).   The question at hand is not whether Mr. Lessert designated the lookout in a manner compliant with regulations, but whether Mr. Schmitz served as the lookout.

[13]No party contests the veracity of the form.

jury could ignore the lookout form in favor of such shaky evidence that Mr. Lessert served as the lookout.

Lastly, defendant argues Mr. Schmitz could not have been the lookout because he carried a shovel, indicating he intended to help clear the switch. (Docket 185 at pp. 27-28).   Mr. Schmitz may well have intended to work on the switch while serving as the lookout.   But evidence he was carrying a shovel does not prove he was not the lookout—at best, it shows he may have been a bad lookout.[14]   In any event, Mr. Mitchell testified each member of the crew carried a tool suitable for clearing the switch.   Under defendant's theory, no member of the crew could have been the lookout, contradicting both Mr. Mitchell's testimony and the lookout form.   The court declines to view as controlling Mr. Schmitz's decision to carry a shovel to the switch.

The court finds Mr. Schmitz served as lookout while the maintenance of way crew worked on the Deadwood wye switch.   Defendant's objection is overruled.

**D.    Legal objections**

Defendant's legal objections all concern the requirements of § 214.315, part of the Federal Railroad Administration's ("FRA") Roadway Worker Protection regulations authorized by the Federal Railroad Safety Act ("FRSA").   The magistrate judge concluded § 214.315 required defendant to provide a safety

---

[14]A regulation requires a lookout not to perform other work.   49 C.F.R. § 214.329(b).   But the court need not—and indeed, could not on the present record—determine if Mr. Schmitz complied with governing regulations while serving as a lookout.   The record is clear he was the lookout; whether he was a good lookout is a question for the jury.

briefing when it assigned Mr. Lessert to clean the switch, which required fouling the track.   (Docket 179 at pp. 12-16).   She further noted § 214.315 appeared to require two safety briefings: the first at the time of assignment and the second at the time the employees foul a track.   Id. at p. 15.   Finally, she rejected defendant's theory that Mr. Lessert was responsible for conducting the assignment safety briefing.   Id. at p. 16.   Relying on her factual finding that Mr. Stirmel assigned Mr. Lessert and his crew to clean the switch, see supra Section II.C.1, the magistrate judge ultimately found defendant violated § 214.315 because there is no dispute that no safety briefing was conducted during the 7:30 a.m. conference call.   Defendant objects to each of these conclusions.   The court overrules each objection.

### 1.   Assignment safety briefing

Defendant argues § 214.315 did not require it to conduct a job safety briefing when it assigned Mr. Lessert to foul a track.   (Docket 185 at pp. 8-14). Because defendant's position cannot be squared with the plain language of the regulation, the court overrules its objection.

Section 214.315 states: "When an employer assigns a duty to a roadway worker that calls for that employee to foul a track, the employer shall provide the employee with an on-track safety job briefing[.]"   49 C.F.R. § 214.315(a). Employer is defined as "a railroad . . . that directly engages or compensates individuals to perform any of the duties defined" by regulation.   Id. at § 214.7. The regulation is straightforward.   When BNSF assigns an employee to foul a

24

track, it must provide a safety briefing.   The most natural interpretation of the language is that the safety briefing must occur at the time of the assignment.

Defendant's only textual argument against the court's reading is that the word "when" "does not explicitly equate to 'at the time of.' "   (Docket 185 at p. 10).   The court rejects this bald assertion.   The word "when" generally links events temporally.   Merriam-Webster defines "when" as "at what time," "at or during which time" or "at or during the time that."   When, Merriam-Webster.com Dictionary.[15]   "In everyday English, 'when' clearly connotes immediacy."   Martinez-Done v. McConnell, 56 F. Supp. 3d 535, 545 (S.D.N.Y. 2014) (internal quotation omitted).[16]   And given that the purpose of the regulation is to "prevent accidents and casualties caused by moving railroad cars . . . striking roadway workers[,]" the court is especially reluctant to cast aside the plain meaning of the adverbial clause.   49 C.F.R. § 214.301. Uncoupling the safety briefing from the assignment of a task could encourage a railroad to leave safety considerations out of the assignment process.

---

[15]Available at https://www.merriam-webster.com/dictionary/when (last visited July 17, 2020).

[16]Martinez-Done interpreted an immigration statute requiring the Attorney General to arrest and detain certain deportable aliens pending a decision on removal "when the alien is released" from state custody.   8 U.S.C. § 1226(c).   In reviewing that statute, the Supreme Court rejected an interpretation requiring immediate arrest due to a presumption that "a statutory rule that *officials* shall act within a specified time does not by itself preclude action later."   Nielsen v. Preap, 139 S. Ct. 954, 967 (2019) (internal quotation omitted) (emphasis added). That presumption does not govern here.   This case does not concern official action, but instead a regulation governing railroad safety.   The court, relying on the ordinary association of "when" with immediate action, concludes the FRA intended the safety briefing to accompany assignment.

Because the regulation is unambiguous, the court need not, as defendant urges, look to its "history, guidance and enforcement to determine the correct meaning."   (Docket 185 at p. 10).   Nevertheless, defendant's reliance on these extratextual sources is unavailing.   Defendant starts its argument by asking the court to apply Auer[17] deference to the FRA's interpretation of § 214.315.   Id. The court declines this invitation.

Auer required federal courts to give "controlling" effect to an agency's interpretation of its own regulations "unless plainly erroneous or inconsistent with the regulation."   519 U.S. at 461 (internal quotation omitted).   The Supreme Court has since sharply limited the boundaries of Auer deference.[18] Kisor v. Wilkie, 139 S. Ct. 2400, 2414-18 (2019).   Now, the court must only defer to the FRA if: the regulation "is genuinely ambiguous" after "exhaust[ing] all the traditional tools of construction[;]" if the FRA's "reading is reasonable[;]" if the "regulatory interpretation [was] one actually made by the [FRA;]" if the FRA's "interpretation . . . in some way implicate[s] its substantive expertise[;]" and if the interpretation reflects the FRA's "fair and considered judgment[.]"   Id. at 2414-17 (internal quotations omitted).   Here, Auer deference is inappropriate. As noted above, the regulation is not ambiguous.

In any event, the FRA interpretation defendant would have the court defer to hardly contradicts the court's reading of § 214.315.   In 1996, the FRA

---

[17]Auer v. Robbins, 519 U.S. 452 (1997).

[18]Defendant filed its objections long after the Supreme Court decided Kisor, making its plea for unlimited Auer deference particularly puzzling.

amended § 214.315.   Roadway Worker Protection, 61 Fed. Reg. 65,959 (Dec. 16,

1996).   It described § 214.315 as requiring that "[e]mployees must be notified

and acknowledge understanding of the on-track safety methods they are to use,

prior to commencing duties on or near the track."   Id. at 65,968.   Section

214.351(a), the paragraph requiring an assignment safety briefing, "establish[es]

the duty of notification by the employer[.]"   Id.   It "essentially require[s] a job

briefing to inform all concerned of on-track safety methods *at the beginning of

each work period.*"   Id. (emphasis added).   As for § 214.315(d), the paragraph

mandating that the roadway worker in charge inform other crew members about

the designated safety procedures, the FRA wrote that it requires the roadway

worker in charge to "conduct an on-track safety briefing prior to the beginning of

work on or near the track.   This briefing *might* also fulfill the requirements of

paragraph (a)[.]"   Id. (emphasis added).

The FRA's 1996 views do not contradict the court's statutory

interpretation.   Paragraph (a) mandates a safety briefing when a job is assigned

that requires an employee to foul a track, but does not control the time of

assignment.   A railroad may assign a job when an employee's workday

commences, as it did here and as the FRA contemplated would be the most

typical practice, or it could assign a job to employees on site.   In the latter case,

the briefing requirements of paragraphs (a) and (d) could be satisfied with a

single, on-site briefing at the time of assignment.

Defendant next asserts the FRA enforces § 214.315 consistent with its

preferred interpretation by approving its internal rules.   (Docket 185 at

pp. 11-12).   BNSF rules "do not require that a briefing be conducted at the time the assignment is first given."   Id. at p. 11; see also (Docket 133-2 at p. 90) (requiring BNSF employees to "[c]onduct a job safety briefing before any roadway worker or equipment fouls a track.").   But BNSF rules, even when approved by the FRA, cannot displace § 214.315(a)'s unambiguous requirement that a safety briefing take place when an employee is assigned to foul a track.   Defendant does not explain why the court should defer to its internal policies.

Finally, defendant raises policy concerns.   It argues requiring a safety briefing at the time of assignment is impractical because it often assigns tasks to multiple work crews over large physical distances during a single call.   (Docket 185 at pp. 12-14).   BNSF managers cannot, in defendant's view, give a proper safety briefing at the time of assignment because they lack awareness of on-site conditions relevant to safety considerations.[19]   Id.   These practical questions are no doubt important to defendant, but they cannot overcome the clear language of the regulation requiring a safety briefing at the time of assignment. If defendant believes the plain language of the regulation is unreasonable or absurd, "the remedy lies with the law making authority, and not with the courts." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982) (quoting Crooks v. Harrelson, 282 U.S. 55, 60 (1930)); see also C.I.R. v. Asphalt Prods. Co., Inc., 482 U.S. 117, 121 (1987) ("Judicial perception that a particular result would be

---

[19]As plaintiff points out, however, Mr. Stirmel testified he "can suggest things to look out for" with regard to on-track safety during a job assignment briefing.   (Docket 191-1 at p. 9).   Mr. Stirmel then agreed with plaintiff's counsel that he could discuss all of the factors required for a § 214.315(a) safety briefing at the time of assignment.   Id. at pp. 9-10.

unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly and intentionally provided.").

In any event, the FRA clearly anticipated the difficulty of predicting on-track conditions.   While the assignment safety briefing requires some prediction of conditions on site, see 49 C.F.R. § 214.315(a)(4) (requiring "discussion" of the "characteristics of the work location"), the regulation also provides for an on-site briefing.   Id. at § 214.315(d).   The on-site briefing provision contemplates "change during the work period" to "on-track safety procedures[.]"   Id.   Thus, a roadway worker in charge is empowered to adapt the crew's safety procedures to changing conditions on site and disseminate that information through a second briefing.   Requiring a safety briefing at the time a job is assigned can hardly be so "unreasonable and nonsensical" as to require ignoring § 214.315(a)'s plain meaning when the FRA addressed the supposedly impractical result in a separate paragraph.   (Docket 185 at p. 14).

The court finds § 214.315(a) requires a railroad to provide a safety briefing when it assigns an employee to foul a track—that is, at the time the assignment is made.   Defendant's objection is overruled.

## 2. Separate safety briefings

Defendant's second objection concerns the interplay between paragraphs (a) and (d) of § 214.315.   The magistrate judge wrote that § 214.315

sets forth two procedures for job safety briefing: the first safety briefing is conducted by the employer at the time the work is

29

assigned, and the second is to be conducted by the roadway worker in charge at the time and location of where the track is to be fouled.

(Docket 179 at p. 15).   Defendant asks the court to reject this interpretation.

(Docket 185 at pp. 14-15).   The court sustains the objection.

Section 214.315(a), which requires a railroad to give a safety briefing at the time it assigns an employee to foul a track, is discussed in detail above.   See supra Section II.D.1.   Section 214.315(d), in contrast, requires an on-track safety briefing.

> Before any member of a roadway work group fouls a track, the roadway worker in charge . . . shall inform each roadway worker of the on-track safety procedures to be used and followed during the performance of the work at that time and location.   Each roadway worker shall again be so informed at any time the on-track safety procedures change during the work period.   Such information shall be given to all roadway workers affected before the change is effective, except in cases of emergency.

49 C.F.R. § 214.315(d).

In many, perhaps most, cases, the safety briefings under paragraphs (a) and (d) will take place at separate times and will be given by separate employees. Paragraph (a) contemplates a safety briefing given by the employee assigning the task at the time the task is assigned, while paragraph (d) concerns the duty of the roadway worker in charge to inform other crew members of the designated safety procedures prior to fouling a track.   Paragraph (d) requires the roadway worker in charge to complete a new briefing if on-site conditions necessitate a change in safety procedures, indicating that briefing will usually occur on site.   The FRA takes a similar view.   It explained in its 1996 amendment that the paragraph (d)

30

briefing should occur "prior to the beginning of work *on or near the track*." 61 Fed. Reg. at 65,968 (emphasis added).

However, the plain terms of the regulation do not mandate two separate briefings.   If a task is assigned while a crew is on site, the briefings under paragraphs (a) and (d) could easily be accomplished together.   The FRA contemplated this possibility by noting the paragraph (d) briefing may satisfy paragraph (a)'s requirements as well in an appropriate case.   Id.

The court doubts the magistrate judge intended her remark as a generally applicable legal conclusion, but defendant is correct that the interpretation will not apply in all cases.   The court sustains defendant's objection.   The R&R is modified to reflect this ruling.

### 3.   Mr. Lessert & the § 214.315(a) safety briefing

Defendant objects to the magistrate judge's conclusion that Mr. Lessert was not an "employer" responsible for conducting the § 214.315(a) safety briefing at the time he was assigned to foul a track.   (Docket 185 at pp. 18-20).   The court overrules the objection.

As a corporate entity, defendant argues, it can only carry out tasks through its employees.   Id. at p. 19.   It contends Mr. Lessert was designated to provide the assignment job safety briefing.   Id.   In defendant's view, the magistrate judge legally erred by rejecting the possibility that Mr. Lessert could have assigned himself to clean the switch.   Id. at pp. 19-20.

As a factual matter, there is no support for the idea that Mr. Lessert assigned himself to clean the switch.   Mr. Stirmel assigned the task.   See supra

31

Section II.C.1.   And as a legal matter, the court shares the magistrate judge's skepticism that defendant can expect an employee to assign himself to foul a track and provide himself with the § 214.315(a) safety briefing.   The FRA intended § 214.315 to establish "the duty of notification [of safety plans] by the employer and the *reciprocal* duty of communicating acknowledgment by the employee."   61 Fed. Reg. at 65,968 (emphasis added).   This would make little sense if the employer and employee were the same person.[20]

Because Mr. Lessert did not assign himself to foul a track, he cannot have been the employer required to provide a § 214.315(a) briefing.   The court overrules defendant's objection.

### 4.   Violation of § 214.315(a)

Defendant's final legal objection is to the magistrate judge's ultimate conclusion that it violated § 214.315(a) by failing to provide a safety briefing during the 7:30 a.m. call where Mr. Stirmel assigned Mr. Lessert and his crew to foul a track.   (Docket 185 at pp. 15-16).   The court determined above that Mr. Stirmel made the assignment during the morning call and that § 214.315(a) requires a safety briefing at the time of assignment.   See supra Sections II.C.1, II.D.1.   It is undisputed Mr. Stirmel did not provide a safety briefing during the

---

[20]Section 214.315(c) would also be heavily impacted by defendant's interpretative theory.   That paragraph requires a railroad to designate a roadway worker in charge for a work crew.   The FRA considered this section "vital to the success of any on-track safety program" and emphasized that "this formal designation [must] be communicated to and understood by all" crew members.   61 Fed. Reg. at 65,968.   If Mr. Lessert was in fact the roadway worker in charge and if, accepting defendant's view, he was an employer who assigned himself to foul a track and was responsible for briefing himself on safety measures, the FRA's intention would be short circuited.

call.   Accordingly, defendant violated § 214.315(a).   Having proven defendant was negligent per se by virtue of a regulatory violation, plaintiff need not make any further showing as to negligence.   <u>Walden v. Ill. Cent. Gulf R.R.</u>, 975 F.2d 361, 364 (7th Cir. 1992) ("In a FELA action, the violation of a statute or regulation . . . automatically constitutes breach of the employer's duty and negligence *per se*[.]").   The court overrules the objection.

### E.   Causation

On the magistrate judge's recommendation, the court gave notice it would consider granting summary judgment on the matter of causation and ordered briefing.   (Docket 181).   Plaintiff proved defendant was negligent per se.   <u>See</u> <u>supra</u> Section II.D.4.   However, plaintiff must still show that the regulatory violation was a causal factor in his death.   <u>Cowden</u>, 975 F. Supp. 2d at 1026. Because plaintiff seeks to establish this element of his claim on summary judgment, the court views the evidence in the light most favorable to defendant, the non-moving party.

FELA allows railway workers to sue for "injury or death resulting in whole or in part from the negligence" of a railroad.   45 U.S.C. § 51.   If the regulatory violation "played a part—no matter how small—in bringing about" Mr. Lessert's death, causation has been established.   <u>CSX Transp.</u>, 564 U.S. at 705.   But "judges . . . have no warrant to submit . . . to the jury" "far out 'but for' scenarios" of causation.   <u>Id.</u> at 704.   And "[p]roof that the employee's own negligence was the *sole* cause of his or her injury is a valid defense because it eliminates the possibility that the regulatory violation contributed in whole or part to the

injury." Walden, 975 F.2d at 364 (emphasis in original).   In evaluating a FELA causation argument, the court is cognizant that "Congress vested the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury."   Rogers v. Mo. Pac. R. Co., 352 U.S. 500, 510 (1957); see also Walden, 975 F.2d at 364 ("When the facts reasonably support a conclusion for either party, the decision is exclusively for the jury to make.").

Plaintiff primarily argues "a proper [safety] briefing would have resulted in the selection of another form of on-track safety" protection.   (Docket 186 at p. 5). Defendant attacks this contention as speculative and argues there is no evidence Mr. Stirmel would have disallowed the use of a lookout as on-track safety protection.   (Docket 187 at pp. 7-10).   Defendant also argues Mr. Lessert would not have used a different form of on-track safety correctly and that a jury could reasonably conclude Mr. Lessert was the sole cause of the incident.   Id. at pp. 11-13, 14-18.

The court finds a genuine dispute exists as to whether Mr. Stirmel would have permitted the use of a lookout.[21]   If Mr. Stirmel had directed or approved

_____

[21]Defendant argues Mr. Stirmel could not have directed the use of any particular form of on-track protection because he was not the roadway worker in charge.   (Docket 187 at pp. 8-9).   The court is unpersuaded.   When an employer assigns an employee to foul a track, it must provide "[i]nformation on the means by which on-track safety is to be provided" and "[i]nstruction on each on-track safety procedure to be followed[.]"   49 C.F.R. §§ 214.315(a)(1), (2). This implies the employer may designate a specific form of on-track protection during the assignment safety briefing.

the use of a lookout, in defendant's view, the incident would have occurred anyway.   But a jury could find that the lack of a safety briefing did not cause the incident because, even if Mr. Stirmel had given the briefing, he would not have directed the use of a non-lookout form of protection.[22]   Given that Mr. Lessert and his crew ultimately decided to use a lookout, it would be reasonable to infer that, had the safety briefing taken place, Mr. Lessert would have requested to use a lookout.

Moreover, jury questions also exist about the role Mr. Lessert and Mr. Schmitz played in the incident.   Mr. Mitchell testified that the three crew members briefly discussed safety before beginning work and decided to use a lookout.   They did not request track exclusivity or any other form of protection. The parties dispute whether the use of a lookout was appropriate under the conditions on site.   (Dockets 187 at pp. 15-16 & 192 at pp. 7-12).   A jury could find Mr. Lessert was the roadway worker in charge and failed to choose the safest form of on-track protection, leading to the incident.   Jurors could also conclude Mr. Lessert failed to ensure Mr. Schmitz properly carried out his duties as lookout based on Mr. Mitchell's testimony that all three crew members carried

---

[22]Plaintiff contends any properly conducted safety briefing would have necessarily resulted in the use of another form of on-track protection.   (Docket 192 at pp. 7-12).   His reasoning relies on a complicated causal chain assuming Mr. Stirmel was intimately familiar both with federal regulations and exact sight distances on site.   Id.   The court cannot endorse plaintiff's theory as a matter of law.   Mr. Stirmel testified both that he had never read § 214.315 before his deposition and that he could not accurately predict conditions on site.   (Docket 173-22 at pp. 10-11).

work tools to the switch.   In these factual scenarios, a jury could reasonably determine Mr. Lessert's own negligence was the sole cause of the incident.

After drawing inferences in defendant's favor and keeping in mind the Supreme Court's admonition that causation is typically a jury matter in FELA cases, the court concludes summary judgment as to causation is inappropriate.

## III.   Plaintiff's Experts

Defendant moved to exclude five of plaintiff's experts under Federal Rule of Evidence 702 and Daubert.[23]   (Docket 112).   The magistrate judge excluded three experts because their proposed testimony pertained only to negligence, which she resolved in plaintiff's favor.   (Docket 184 at pp. 3-4).   She excluded a fourth expert, Dr. Mariusz Ziejewski, because his proposed testimony related to either negligence—no longer an issue in the case—or the question of whether Mr. Lessert survived the initial train strike for long enough to incur pain and suffering, a question she also resolved on summary judgment in defendant's favor.   Id. at pp. 4-5.   Finally, she permitted plaintiff's damages expert, economist Dr. Stan Smith, to testify regarding Mr. Lessert's widow and children, but not his unadopted stepdaughter.   Id. at pp. 6-10.   Defendant objects to allowing Dr. Smith to testify at all.[24]   (Docket 189).   Reviewing the magistrate judge's order for clear error, see 28 U.S.C. § 636(b)(1)(A), the court sustains one

---

[23]Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

[24]Plaintiff did not object to the magistrate judge's Daubert ruling.   The court adopts the order as it pertains to plaintiff's other experts.

objection in part and overrules the remainder.    The order is affirmed as modified by this opinion.

### A.    Legal Standard

Federal Rule of Evidence 702 permits expert witnesses to testify if:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.    The United States Court of Appeals for the Eighth Circuit has "boiled down" Rule 702's "screening requirement" into a test:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.    This is the basic rule of relevancy.    Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

Johnson v. Mead Johnson & Co., LLC, 754 F.3d 557, 561 (8th Cir. 2014) (quoting Polski v. Quigley Corp., 538 F.3d 836, 839 (8th Cir. 2008)).    "[T]he proponent of the expert testimony" bears the burden to show its admissibility "by a preponderance of the evidence[.]"    Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757-58 (8th Cir. 2006).

In evaluating the reliability of proposed expert testimony using a particular theory or technique, the court can consider "whether it can be (and has been)

tested[,]" whether it "has been subjected to peer review and publication[,]" its

"known or potential rate of error" and its "general acceptance[.]"   Daubert, 509

U.S. at 593-94.   The court need only consider these factors to the extent they

are "reasonable measures of reliability[.]"   Kumho Tire Co. Ltd. v. Carmichael,

526 U.S. 137, 153 (1999).   The Rule 702 inquiry is "a flexible one."   Daubert,

509 U.S. at 594.   Its focus "must be solely on principles and methodology, not

on the conclusions that they generate."   Id. at 595.

The court "must exclude expert testimony if it is so fundamentally

unreliable that it can offer no assistance to the jury, otherwise, the factual basis

of the testimony goes to the weight of the evidence."   United States v. Two Elk,

536 F.3d 890, 903 (8th Cir. 2008) (quoting Larson v. Kempker, 414 F.3d 936,

940-41 (8th Cir. 2005)) (emphasis removed).   "Courts should resolve doubts

regarding the usefulness of an expert's testimony in favor of admissibility."

Marmo, 457 F.3d at 758.   "Vigorous cross-examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence."

Daubert, 509 U.S. at 596.   "However, a court should not admit opinion evidence

that is connected to existing data only by the *ipse dixit* of the expert.   When the

analytical gap between the data and proffered opinion is too great, the opinion

must be excluded."   Marmo, 457 F.3d at 758 (internal quotation and citation

omitted).

### B.    Defendant's Objections

Defendant raises nine objections to the magistrate judge's order.   As

summarized by the court, these objections argue:

1.    The magistrate judge "did not conduct a sufficient <u>Daubert</u>
      analysis" and "did not scrutinize Dr. Smith's individual
      opinions."   (Docket 189 at pp. 4-6).

2.    Dr. Smith's damages opinion includes costs for loss of
      consortium and costs incurred by Mr. Lessert's adult
      children, which are not recoverable in FELA cases as a matter
      of law.   <u>Id.</u> at pp. 7-9.

3.    Dr. Smith relied on flawed studies in determining the loss of
      household services caused by Mr. Lessert's death.   <u>Id.</u> at
      pp. 9-11.

4.    Dr. Smith assumed the value of Mr. Lessert's household
      services to his family members is equivalent to professionals.
      <u>Id.</u> at pp. 11-12.

5.    Dr. Smith inflated his household services damages estimate
      by double-counting hours of services provided.   <u>Id.</u> at
      pp. 12-14.

6.    Dr. Smith improperly added an "agency fee" to his household
      services damages estimate.   <u>Id.</u> at pp. 14-15.

7.    Dr. Smith used a "flawed" methodology to calculate Mr.
      Lessert's personal consumption spending.   <u>Id.</u> at pp. 15-16.

8.    Dr. Smith made an arbitrary assumption as to Mr. Lessert's
      tax rate in calculating damages.   <u>Id.</u> at pp. 16-17.

9.    Dr. Smith made an arbitrary assumption as to Mr. Lessert's
      retirement date in calculating damages.   <u>Id.</u> at pp. 17-19.

As plaintiff points out, defendant did not raise most of these arguments

before the magistrate judge.   (Docket 194 at pp. 4-5).   In fact, by the court's

count, defendant only specifically raised two of the arguments it now asserts: its

critique of Dr. Smith's retirement age assumption and his use of professional

wages to estimate the loss of household services.   (Docket 113 at pp. 26-29).

> When a magistrate judge is hearing a matter pursuant to his or her
> limited authority to make a recommended disposition, a claimant
> must present all his claims squarely to the magistrate judge, that is,
> the first adversarial forum, to preserve them for review. . . . "A party
> cannot, in his objections to an R&R, raise arguments that were not
> clearly presented to the magistrate judge."

Ridenour v. Boehringer Ingleheim Pharms., Inc., 679 F.3d 1062, 1067 (8th Cir.

2012) (quoting Hammann v. 1-800-Ideas.com, Inc., 455 F. Supp. 2d 942, 947-48

(D. Minn. 2006)).

The court would be well-justified in finding defendant waived its untimely

objections.   Nevertheless, the court will evaluate the objections out of concern

for judicial economy.   Defendant could simply raise these arguments again in a

motion *in limine* or at trial, at which point the court would be obligated to decide

the matter.   Resolving the objections before trial will facilitate the orderly

progression of this case.

### C.   Analysis

The court begins by addressing defendant's reliance on a number of other

federal cases excluding Dr. Smith as an expert.   Dr. Smith often opines on

"hedonic damages" in litigation, which are damages that "attempt to compensate

a victim for the loss of the pleasure of being alive[.]"   Families Advocate, LLC v.

Sanford Clinic N., No. 16-CV-114, 2019 WL 1442162, at *1 (D.N.D. March 31,

2019).   Quite a few federal courts have refused to permit Dr. Smith to testify

40

concerning his method for calculating hedonic damages.   Smith v. Jenkins, 732 F.3d 51, 66 (1st Cir. 2013) (collecting cases).

Here, however, plaintiff expressly disclaims any claim for hedonic damages.   (Docket 194 at p. 23 n.15) ("[T]here is no claim for hedonic damages and no economic evaluation of hedonic damages is proffered by Plaintiff or Dr. Smith.").   The court therefore does not view the authority defendant cites as indicative of a uniform condemnation of Dr. Smith's testimony in the federal courts, as its objections insinuate.

### 1.   Magistrate judge's **Daubert** analysis

Defendant first asserts the magistrate judge "did not hold plaintiff to his burden" of proving the admissibility of Dr. Smith's proposed testimony.   (Docket 189 at p. 5).   It argues she failed to apply the Rule 702 factors and insufficiently scrutinized his report.   Id. at pp. 4-6.   The court overrules this objection.

Defendant devoted approximately five pages of its 33-page brief before the magistrate judge to Dr. Smith's household services opinions.   (Docket 113 at pp. 25-30).   One of those pages is merely copied images of Dr. Smith's deposition.   Id. at p. 27.   And as the magistrate judge noted, the parties filed over 400 pages of record materials concerning the Daubert motion.   The court can hardly fault the magistrate judge for not divining arguments defendant did not make and combing the record with a fine-toothed comb to address them.

In any event, the magistrate judge cited the correct legal standards governing a Daubert challenge.   (Docket 184 at pp. 2-3, 7-8).   She began by

41

finding Dr. Smith qualified to give his opinions.[25]   <u>Id.</u> at pp. 8-9.   She then

considered defendant's arguments concerning the basis for Dr. Smith's

retirement and household services assumptions and determined they were

challenges to the weight of his opinions, rather than to the admissibility.   <u>Id.</u> at

pp. 9-10.   This conclusion was not error, clear or otherwise.

The court rejects defendant's assertion that the magistrate judge failed to

"provid[e] specific findings or discussion on the record[.]"   (Docket 189 at p. 5).

As demonstrated by its affirmance on de novo review, the court finds the

magistrate judge correctly resolved defendant's <u>Daubert</u> challenge.

### 2.    Loss of consortium & costs for adult children

Defendant argues plaintiff cannot recover damages for loss of Mr. Lessert's

consortium or for loss of the services Mr. Lessert would have provided to his

children after they became adults as a matter of law.   In its view, Dr. Smith

includes such damages in his calculation, rendering his opinion unreliable.

Plaintiff responds that the contested damages are available as a matter of law.

(Docket 194 at pp. 5-8).   The court agrees with plaintiff and overrules the

objection.

In calculating the loss of Mr. Lessert's "household/family services[,]" Dr.

Smith included the value of his "advice, counsel, and guidance services" and

"accompaniment services, or care and attention services[.]"   (Docket 144-9 at

pp. 6, 30-41).   In his view, these services are distinct from "consortium, intimate

---

[25]No party challenges this conclusion and the court likewise finds Dr.
Smith qualified to testify.

relations, love, and affection" and "do[] not require any particular physical work activity or intimacy" but are similar to "what can be provided by a hired home health aide or an adult sitter."   Id. at p. 6 (internal quotations omitted).

"In a wrongful-death action under the FELA, the measure of recovery is 'the damages that flow from the deprivation of the pecuniary benefits which the beneficiaries might have reasonably received.' "   Norfolk & W. Ry. Co. v. Liepelt, 444 U.S. 490, 493 (1980) (quoting Michigan Cent. R. Co. v. Vreeland, 227 U.S. 59, 70 (1913)) (internal alterations omitted).

> A pecuniary loss or damage must be one which can be measured by some standard. . . . Nevertheless, the word as judicially adopted is not so narrow as to exclude damages for the loss of services of the husband, wife, or child, and, when the beneficiary is a child, for the loss of that care, counsel, training, and education which it might, under the evidence, have reasonably received from the parent, and which can only be supplied by the service of another for compensation.

Vreeland, 227 U.S. at 71; see also Norfolk & W. R. Co. v. Holbrook, 235 U.S. 625, 629 (1915) ("It was proper, therefore, to charge that the jury might take into consideration the care, attention, instruction, training, advice, and guidance which the evidence showed [the decedent] reasonably might have been expected to give his children during their minority, and to include the pecuniary value thereof in the damages assessed.").   However, "[t]he loss of society and companionship, and of the acts of society which originate in the relation and are not in the nature of services, are not capable of being measured by any material standard."   Vreeland, 227 U.S. at 73.   Looking to Vreeland, courts have generally concluded that loss of consortium claims are not cognizable under

43

FELA.   See Vigil v. Union Pac. R.R. Co., No. 16-cv-160, 2016 WL 10538999, at *3 (D.N.M. 2016) (collecting cases).

The fighting question here thus concerns the nature of the care and attention services included in Dr. Smith's damages calculation.   If the services have a pecuniary value susceptible of objective measurement, plaintiff may recover their cost in damages under Vreeland and Holbrook.   But if the services are merely the "loss of society and companionship . . . not in the nature of services" which are "not capable of being measured by any material standard[,]" their cost is unrecoverable as a prohibited loss of consortium claim.[26]   Vreeland, 227 U.S. at 73.

The court finds the damages permissible.   Dr. Smith was able to measure the monetary value of the care and attention services by considering the prevailing wage of workers engaged in childcare, nursing, home health care and personal care, adjusted for South Dakota's economic conditions.   (Docket 144-9 at pp. 9-10).   He factored these costs into his estimate of the total value of Mr. Lessert's services to his family.   Id. at pp. 9-11.   The damages are "capable of measurement by some pecuniary standard" because they can be estimated using

---

[26]The tort of loss of consortium is an inexact fit for the "loss of society and companionship" disapproved of in Vreeland.   227 U.S. at 73.   The Second Restatement of Torts defines loss of consortium as "loss of the society and services of the [injured] spouse, including impairment of capacity for sexual intercourse, and for reasonable expense incurred by the [uninjured] spouse in providing medical treatment."   Restatement of Torts (Second) § 693(a) (1977); see also Norfolk & W. Ry. Co. v. Ayers, 538 U.S. 135, 148 (2003) (looking to Second Restatement of Torts to define damages in FELA case).   But Vreeland clearly permits FELA plaintiffs in a wrongful-death action to seek damages for lost services, which would seem to otherwise be encompassed by a generic loss of consortium action.

the cost Mr. Lessert's family would have had to pay to obtain the services on the private market.   Vreeland, 227 U.S. at 74.   Indeed, Vreeland itself contemplated this method of measuring damages.   Id. at 71 (FELA does not "exclude damages . . . when the beneficiary is a child, for the loss of that care, counsel, training, and education which it might, under the evidence, have reasonably received from the parent, and which can only be supplied by the service of another for compensation.").   Because Mr. Lessert's care and attention services can be translated into dollars and cents by a jury on an objective standard, plaintiff may recover those costs.   It follows that Dr. Smith's expert opinion cannot be unreliable simply for providing a possible conversion factor.

The court next considers whether Dr. Smith may include the value of Mr. Lessert's services to his children after they attained adulthood in his damages calculation.   Dr. Smith estimated Mr. Lessert provided 25 hours of services per week to his children through age 22 and 15 hours per week thereafter.   (Docket 144-9 at p. 9).   He calculated the value of Mr. Lessert's services to the children through the year 2060, at which point one child would be 50 and the other 54. Id. at pp. 37 & 40.   It appears the children are now 10 and 14.   Id.

The extent to which Mr. Lessert's children could have expected to receive his services after they reach adulthood is a jury question.   The cases defendant cites in support of its proposed rule limiting recovery to the costs for services which would have been provided during the children's minority merely confirm the factual nature of the matter.   In Chicago, Burlington & Quincy R.R. Co. v.

45

Kelley, the Eighth Circuit held a district court should have instructed a FELA jury that the plaintiff was not entitled to recover for the pecuniary loss to the decedent's children after they reached adulthood.   74 F.2d 80, 85 (8th Cir. 1934).   The court concluded "[t]here was no evidence from which the jury could have found any expectation of support for the children after majority."   Id.   And in Thompson v. Camp, the United States Court of Appeals for the Sixth Circuit concluded that "[i]n the absence of evidence that an adult child is either dependent upon or had any reasonable ground for expecting any pecuniary benefit from a continuance of the decedent's life, a recovery on behalf of such child is excluded."   163 F.2d 396, 403 (6th Cir. 1947).

Modern cases confirm that recovery in a FELA case for loss of services to an adult child is fact-dependent.[27]   And this principle flows generally from the key point the Supreme Court set forth in its FELA damages cases: "damages should be equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased."   Cheseapeake & Ohio Ry. Co. v. Kelly, 241 U.S. 485, 489 (1916) (citing Vreeland, 227 U.S. at 70-71).   If plaintiff can show Mr. Lessert's

---

[27]See, e.g., Monheim v. Union R.R. Co., 996 F. Supp. 2d 354, 371 (W.D. Penn. 2014) ("An adult child may recover pecuniary damages for periods of time after he or she reaches the age of majority if there is evidence sufficient to prove special circumstances, such as a poor health, permanent physical infirmity, or limited mental abilities."); Davis v. CSX Transp., Inc., No. 10CV74, 2012 WL 71362 at *2 (N.D. W. Va. Jan. 10, 2012) ("An adult child of the decedent may also recover pecuniary damages after the age of majority if there is evidence introduced to show such damages."); Kornblum v. CSX Transp., Inc., 03-CV-57, 2005 WL 1241862, at *2 (S.D. Ind., May 24, 2005) (same).

adult children would have received services from him after becoming adults, the cost of those services is recoverable.

The only question before the court now is whether such damages are available under FELA.   They clearly are.   The scope of the damages is not presently at issue.   The court finds Dr. Smith's opinion is not unreliable because he calculated post-majority damages for Mr. Lessert's children.

Defendant's objection is overruled.

### 3.   Loss of household services studies

Defendant next attacks two of the studies Dr. Smith relied on to support his methodology for calculating the household services Mr. Lessert provided to his family.[28]   (Docket 189 at pp. 9-11).   It argues the methodology is not generally accepted in the economic field, pointing to the arguments of its own expert, Dr. Thomas Ireland.   Id. at p. 9.   Defendant also criticizes Dr. Smith's citation of an article written by an attorney who represents FELA plaintiffs.   Id. at p. 10.   The court does not find Dr. Smith's methodology unreliable.

Dr. Smith interviewed Mr. Lessert's widow and sister to determine the extent and types of services he provided to the family.   (Docket 144-9 at pp. 6-9). Based on those interviews, he concluded Mr. Lessert provided 35 hours per week of services to his wife and 25 hours per week to his children.   Id. at p. 9.   He further concluded the services included, among others, mechanical work,

---

[28]Defendant also asserts Dr. Smith's methodology has been rejected by two federal courts.   (Docket 189 at pp. 10-11) (citing Mercado v. Ahmed, 974 F.2d 863, 871 (7th Cir. 1992); Kurncz v. Honda N. Am., 166 F.R.D. 386 (W.D. Mich. 1996)).   Both cases concerned Dr. Smith's calculation of hedonic damages, which are not at issue in this case.   See supra Section III.C.

housekeeping, childcare, accounting, counseling, teaching and driving.   Id. at pp. 9-10.   Dr. Smith then looked to federal Bureau of Labor statistics to determine the mean wage of workers providing those services in the private market, adjusted the wage for South Dakota's labor costs, and added an "agency fee" to account for non-wage costs a consumer pays to obtain the services of a freelance worker.   Id. at pp. 9-11.   In total, he calculated Mr. Lessert's services to his family were worth $16.30 per hour as of 2017.   Id. at p. 9.

The two studies defendant attacks are: "Household Services: Toward a More Comprehensive Measure" by Dr. Frank Tintari and "Maximizing Recovery in FELA Wrongful Death Actions" by attorney William Jungbauer.   (Docket 144-9 at pp. 6 & 15).   These articles support Dr. Smith's view that "a complete analysis of all services performed by family members includes much, much more than the physical housekeeping chores."   Id. at p. 15.

Defendant asserts plaintiff failed to provide any proof that Dr. Tintari's "position has been accepted by forensic economists."   (Docket 189 at p. 9).   It cites criticism of Dr. Tintari's work by its own expert, Dr. Ireland.   Id.   But "[g]eneral acceptance is not a necessary precondition to the admissibility of [expert] evidence[.]"[29]   United States v. Rodriguez, 581 F.3d 775, 794 (8th Cir. 2009) (citing Daubert, 509 U.S. at 597).   Here, the methodology Dr. Smith uses was already approved, in broad strokes, by the Supreme Court in Vreeland.   227 U.S. at 71, 73.   Attacks on the particular costs or formulas Dr. Smith used in

---

[29]Defendant's citation to a pre-Daubert case for the proposition that an "expert consensus" is necessary before a court may admit expert testimony is unpersuasive.   (Docket 189 at p. 10) (citing Mercado, 974 F.2d at 871).

his estimate affect its weight, not its admissibility, and may be addressed on cross-examination.   And in any event, the cited criticism from Dr. Ireland—that "an economist cannot reliably quantify inestimable damages for companionship and loss of society"—merely restates defendant's position that Dr. Smith is attempting to smuggle a prohibited loss of consortium claim into this case. (Docket 189 at p. 9).   The court rejected that argument above.   See supra Section III.C.2.

Defendant next attacks Dr. Smith's citation of an article written by an attorney who represents FELA plaintiffs.   (Docket 189 at p. 10).   It is true Dr. Smith appears to have inaccurately described Mr. Jungbauer as an economist, although the court notes no party states whether Mr. Jungbauer's co-author, Mark Odegard, is an economist.   (Docket 144-9 at p. 15).   In any event, the article is part of a larger compilation titled "Assessing Family Loss in Wrongful Death Litigation: The Special Roles of Lost Services and Personal Consumption." Id.   According to Dr. Ireland's CV, available on his academic website, he wrote the book in which the article appeared.[30]   Given that the supposedly biased article appeared in a book written by defendant's own expert, the court cannot conclude Dr. Smith's citation of this article is indicative of any unreliability, much less an unreliability so pervasive as to require excluding his opinion as a whole.   If defendant believes Dr. Smith is biased in favor of plaintiff's interests, it may attempt to expose that bias through cross-examination.

---

[30]See Thomas B. Ireland, Ph.D., Professor Emeritus of Economics, University of Missouri St. Louis, available at http://www.umsl.edu/~irelandt/ (last visited July 22, 2020).

Defendant's objection is overruled.

### 4.   Value of Mr. Lessert's household services

Defendant's fourth, fifth and sixth objections complain that Dr. Smith inflated the value of Mr. Lessert's household services.   (Docket 189 at pp. 11-15).   It argues the cost of Mr. Lessert's household services should not be calculated with reference to the wages of professional workers, that the services he provided to his widow and children should not be calculated separately, and that it is inappropriate to add an agency fee to account for the non-wage costs of hiring freelance workers.   Id.   And again, defendant cites cases rejecting Dr. Smith's calculation of hedonic damages in an attempt to persuade the court that all of his opinions are unreliable.   Id. at pp. 13-15 (citing Smith, 732 F.3d at 65; Saia v. Sears Roebuck & Co., 47 F. Supp. 2d 141 (D. Mass 1999); Families Advocate, 2019 WL 1442162 at *1).

These objections simply quibble with the weight that should be assigned to Dr. Smith's opinion.   See David E. Watson, P.C. v. United States, 668 F.3d 1008, 1014 (8th Cir. 2012) ("Generally, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") (internal quotation omitted).   The court found above that these costs are not barred as a matter of law and that Dr. Smith's methodology is not unreliable.   See supra Sections III.C.2, 3.   Defendant has its own methodology for calculating household services to present to the jury.   (Docket 190-1 at pp. 9-13) (assigning a value of $27.49 per day to Mr. Lessert's household

services).   The jury will be required to decide the value of Mr. Lessert's household services, if any.   Dr. Smith's or Dr. Ireland's methodology may aid them in their calculation.

The objections are overruled.

### 5.   Personal consumption

Defendant's seventh objection attacks Dr. Smith's methodology for calculating Mr. Lessert's personal consumption.   Personal consumption refers to the money Mr. Lessert earned "that would not have been used to provide financial support" for his family.   (Docket 190-1 at p. 5).   Defendant first objects to including Mr. Lessert's unadopted stepdaughter in Dr. Smith's personal consumption analysis.   (Docket 189 at p. 16).   The basis for this argument appears to be that Dr. Smith borrowed a personal consumption assumption from another source for a five-person family.[31]   (Docket 144-9 at p. 4).   Excluding the stepdaughter, Mr. Lessert's family included only four members.   Given that the magistrate judge ruled no costs can be recovered for the stepdaughter in an R&R which the court adopts in full, see infra Section IV, the court will sustain this portion of defendant's objection.   Dr. Smith may not calculate Mr. Lessert's personal consumption with reference to a five-person family.

---

[31]Although no party explained the correlation between the size of a family and the rate of income one retains for personal consumption, the court imagines the assumption is that the amount of income spent on family increases in proportion to the family size.

51

Defendant next asserts Dr. Smith "does not explain how he arrived" at the percentages he used to calculate personal consumption.   (Docket 189 at p. 16). But, as defendant acknowledges, Dr. Smith borrowed the percentages from the Ruble-Patton Personal Consumption tables.   Id.   Defendant's real complaint appears to be that Dr. Ireland borrowed slightly different percentages from the same source.   (Docket 190-1 at pp. 5-6).   Dr. Ireland wrote that the difference had a negligible impact on the loss calculation.   Id. at p. 6.   As no party provided the court with a copy of the Ruble-Patton tables, the court cannot validate one set of percentages over the other.   Nor would it matter in any event—it is the jury's prerogative to determine the extent to which Mr. Lessert's lost earnings should be offset by his personal consumption, if at all.   This portion of defendant's objection is overruled.

### 6.   Tax rate & retirement age

Defendant's last two objections concern assumptions Dr. Smith made about defendant's tax rate and retirement age.   (Docket 189 at pp. 16-19).   Dr. Smith assumed a 10 percent tax rate for wage and interest earnings.   (Docket 144-9 at pp. 3 & 60-61).   Dr. Smith explained during his deposition that the assumption was based on Mr. Lessert's effective tax rate, or the average rate he paid across all of his tax brackets as opposed to the top marginal tax rate he paid on the last dollar of his income.   (Docket 194-1 at p. 4).   The effective tax rate calculation is included in his report.   (Docket 144-9 at pp. 60-61).   Defendant's allegation that Dr. Smith's tax assumption is "arbitrary" and unexplained is clearly false.   (Docket 189 at p. 16).

In his tax assumption, Dr. Ireland added railroad retirement taxes, also known as Tier I and Tier II taxes.   (Docket 190-1 at p. 4).   "[W]hether these taxes must be deducted from FELA lost future earnings is not well-settled." Cowden v. BNSF Ry. Co., 980 F. Supp. 2d 1106, 1124 (E.D. Mo. 2013) (excluding evidence of railroad retirement taxes); see also Riley v. Union Pac. R. Co., No. CIV-09-155, 2010 WL 1946286 at *1 (E.D. Okla. May 13, 2010) (same); Stevenson v. Union Pac. R.R. Co., No. 07CV00522, 2009 WL 652932 at *2 (E.D. Ark. March 12, 2009) (reserving ruling on admissibility of railroad retirement taxes until trial).   In 1996, the Supreme Court of Virginia noted the lack of "a single FELA decision from either a federal or a state court holding that such retirement payments should be deducted from gross income in calculating net income."   Norfolk & W. Ry. Co. v. Chittum, 468 S.E.2d 877, 882 (Va. 1996). The court gives notice it does not intend to admit such evidence without firm supporting legal authority from its proponent.

Defendant next takes issue with Dr. Smith's assumption as to Mr. Lessert's retirement age.   Dr. Smith assumed Mr. Lessert would retire at age 67 because that would be the date he could retire with full benefits under the Social Security system.   (Docket 194-1 at p. 4).   However, Dr. Smith also provided a calculation of Mr. Lessert's wages until age 79.   (Docket 144-9 at p. 25). Defendant believes Mr. Lessert would have retired at age 60, when he would have become eligible for his railroad pension.   (Docket 189 at pp. 17-18).

This is a classic factual issue for the jury.   There is no record evidence from which the court can determine as a matter of law at what age Mr. Lessert

would have retired.   The jury will be entitled to weigh "the possibility of earlier retirement, injury, illness or other reason that Mr. Lessert would not have continuously worked until age 67[,]" as defendant asks.   (Docket 189 at p. 18). Dr. Smith's opinion will be useful to jurors because it provides data they may use in calculating damages after settling on a retirement age.   Dr. Smith need not, as defendant seems to demand, account for all retirement possibilities in his expert report.

Finally, the court rejects defendant's argument that a jury cannot rely on Dr. Smith's "testimony [as] a mere tool, aid, or guide for the jury[.]"   Id.   A quintessential purpose of an expert witness is to provide the jury with tools to calculate damages.   In support of its odd proposition, defendant cites Kurncz, where the district court excluded Dr. Smith's hedonic damages calculation because it was insufficiently precise to aid jurors.   166 F.R.D. at 390-91.   A lost wages calculation, however, is an easier task than attempting to gauge the value of lost enjoyment of life.   Dr. Smith's opinion does not establish an arbitrary benchmark for calculating inherently indeterminable damages, nor does it raise any danger of jury confusion.   And more generally, the court refuses to apply Daubert cases from the controversial hedonic damages context here, where plaintiff asks for more widely accepted categories of damages.

Defendant's eighth and ninth objections are overruled.

## IV.   Plaintiff's Damages

The magistrate judge recommended granting defendant partial summary judgment as to plaintiff's claims for Mr. Lessert's "conscious pain and suffering"

immediately following the incident and "losses sustained by Mr. Lessert's unadopted stepdaughter." (Docket 180 at p. 1). She found the record contained no evidence to show Mr. Lessert was conscious for any amount of time after he was struck by the train. Id. at pp. 5-13. She further concluded South Dakota law determines who qualifies as a beneficiary in a FELA action and specifically excludes stepchildren from its definition of child. Id. at pp. 13-17. No party objects to the damages R&R and the court, upon de novo review, finds it to be a correct and appropriate resolution of defendant's motion for partial summary judgment. The court adopts it in full. Plaintiff may not seek damages for Mr. Lessert's conscious pain and suffering or for losses sustained by his stepdaughter.

## V.   Conclusion

The court finds defendant violated 49 C.F.R. § 214.315(a) by failing to provide Mr. Lessert and his crew with the mandatory safety briefing when it assigned them to foul the Deadwood wye switch during a call on the morning of January 17, 2017. This regulatory violation constitutes negligence per se. The court thus grants summary judgment to plaintiff on the issue of negligence. However, the jury must determine whether defendant's regulatory violation caused Mr. Lessert's death. The court adopts the magistrate judge's negligence R&R as modified by this opinion.

The court further finds Dr. Stan Smith is qualified to testify. His opinions are reliable and admissible under Rule 702. The court affirms the magistrate judge's Daubert order with the sole modification that Dr. Smith may not include

any reference to defendant's unadopted stepdaughter in his personal consumption testimony to the jury.

Finally, the court adopts the magistrate judge's damages R&R in full.

## ORDER

For the reasons given above, it is

ORDERED that defendant's objections to the magistrate judge's <u>Daubert</u> order (Docket 189) are sustained in part and overruled in part.

IT IS FURTHER ORDERED that the magistrate judge's <u>Daubert</u> order (Docket 184) is affirmed as modified by this opinion.

IT IS FURTHER ORDERED that defendant's objections to the magistrate judge's report and recommendation on negligence (Docket 185) are sustained in part and overruled in part.

IT IS FURTHER ORDERED that the magistrate judge's report and recommendation on negligence (Docket 179) is adopted as modified by this opinion.

IT IS FURTHER ORDERED that defendant's motions for partial summary judgment (Dockets 47, 115 & 129) are denied.

IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment (Docket 108) is granted.

IT IS FURTHER ORDERED that the magistrate judge's report and recommendation on damages (Docket 180) is adopted in full.

IT IS FURTHER ORDERED that defendant's motion for partial summary judgment (Docket 104) is granted.

IT IS FURTHER ORDERED that the parties shall contact the court on or before **October 2, 2020** to schedule a trial on causation and damages.

Dated August 5, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE