UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| GERALD LESSERT, SPECIAL ADMINISTRATOR OF THE ESTATE OF RICHARD CLAYMORE LESSERT, DECEASED; AND RICHARD CLAYMORE LESSERT,<br><br>Plaintiffs,<br><br>vs.<br><br>BNSF RAILWAY COMPANY, A CORPORATION;<br><br>Defendant. | 5:17-CV-05030-RAL<br><br><br><br>OPINION AND ORDER VACATING SUMMARY JUDGMENT DECISION |

This case involves a horrible work-related accident on January 17, 2017, at the west switch of the Deadwood wye costing Richard Lessert and Doug Schmitz their lives. In an Order dated August 5, 2020, the district judge then-assigned to the case entered partial summary judgment on the claim of violation of 49 C.F.R. § 214.315(a) for Plaintiffs Gerald Lessert, Special Administrator of the Estate of Richard Claymore Lessert, Deceased and Richard Claymore Lessert (Plaintiff).[1] Doc. 196.[2] Defendant BNSF Railway Company (BNSF) sought to have the partial

---

[1] Because Plaintiff Gerald Lessert has the same last name as his son Richard Lessert, this Opinion and Order refers to Richard Lessert as Lessert and to Gerald Lessert as Plaintiff.
[2] The summary judgment proceedings were initially referred to a United States Magistrate Judge, who issued a report and recommendation, Doc. 179, which the district judge for the most part adopted in the August 5, 2020 Order, albeit with slightly different reasoning.

1

summary judgment order certified for interlocutory appeal, which the court denied. Docs. 197, 202. Thereafter, on April 7, 2022, the case was reassigned to the undersigned judge.

A jury trial of this case began on April 10, 2023, before the undersigned and continued through April 14, 2023, at which point both sides had rested their evidence and this Court had distributed draft final jury instructions. By that point, the undersigned had read multiple deposition transcripts that had been designated for use at trial and had heard testimony from both live witnesses and those presented by deposition. This Court in the draft jury instructions was "threading the needle" by trying to give as much fidelity to the prior judge's grant of partial summary judgment while recognizing that there was a question of fact undermining the reasoning in that partial summary judgment order. See Doc. 302 at 5. Plaintiff's counsel on the record made statements acknowledging that the safety briefing contemplated by § 214.315(a) did not have to be at the time when the prior judge in granting summary judgment ruled that it must be. Doc. 302 at 11. Noting that both sides had substantial risks and that an appeal was likely regardless of the trial's outcome, this Court suggested that the parties revisit settlement discussions. Over the weekend and before the proposed instructions were finalized, the parties settled the case on terms that included a joint motion for vacating the partial summary judgment order. This Court now grants that joint motion.

Some understanding of the core facts is necessary to explain this Court's decision to vacate the partial summary judgment order. Richard Lessert had worked for BNSF for approximately ten years prior to his death. Lessert at the time of his death was the foreman of BNSF's Edgemont maintenance of way crew. On January 17, 2017, that crew consisted of foreman Lessert, truck driver Doug Schmitz who had worked for BNSF since 1977, and trackman/laborer Stanley Mitchell who had worked for BNSF since 1979. Only Mitchell would survive that day.

2

At trial, BNSF presented much testimony about the training, testing, and experience of the three on the Edgemont maintenance of way crew, which is not central to this particular decision. There are several methods recognized by the Federal Railroad Administration (FRA) and in turn BNSF's manuals to ensure on-track safety of those railway workers who foul (that is, work on or within four feet of) track, including obtaining "track and time" authority obtained through the dispatcher, Form B protection which requires a lead time of at least 12 hours, "train coordination" or "train on track" situations where the locomotive is stopped nearby such as when train crew clear the track or get off to trigger a switch, and watchman/lookout protection. Watchman/lookout protection is only proper when the sight distances and work conditions are sufficient to allow for a dedicated lookout, who is not to do any work or be distracted in any way, to see an approaching train or other equipment on the track and warn those working in sufficient time to allow them to get to a designated place of safety at least fifteen seconds before the train or other equipment arrives. Lessert and others have a "mobile client laptop" to show them where trains are and are heading. BNSF employees can use a mobile client laptop to confirm that they have "track and time," and BNSF workers can use radio and cellphones to contact dispatch to seek, obtain, and release "track and time."

The Edgemont BNSF location is part of BNSF's Powder River Division. In January 2017, Charles Oleson was the roadmaster for the division including Edgemont. Oleson customarily would conduct a daily "morning call" at 7:30 a.m. to discuss with those in offices within the Powder River Division what was occurring and what work was to be done that day. Oleson was scheduled to be in Scottsbluff, Nebraska, on January 17, 2017, on railroad business and thus unavailable for the call. Oleson delegated responsibility to lead the morning call to the Newcastle office track inspector Dennis Stirmel. Probably the night before the call or possibly early in the

morning before the call, Oleson learned and told Stirmel that a "test train" was going to be accessing the Deadwood wye and hooking up to railcars that had long sat dormant on the wye.

The Deadwood wye is a spur off the main line to allow for trains to turn direction and to provide track on which to store railcars. The Deadwood wye directs trains off the main line through one of two switches—a west wye switch where this accident occurred and a separate east wye switch. There is at least one other switch within the wye itself apart from the main line. BNSF had parked railcars many months prior on the wye, and snow had fallen a few days before January 17, 2017.

The test train arrived at the Deadwood wye early in the morning of January 17 and stopped on the main line track. Two train crew members—Randy Dixon and Michael Smeltzer—got out on the track to clean snow and ice from the west wye switch while the train sat on the tracks providing the on-track safety; dispatch could tell that the train remained on the tracks at that location and the system prevented another train from using that same track in that area. Dixon and Smeltzer ultimately used a pipe as a "cheater bar" to force the switch to move to allow access of the locomotive onto the wye. The use of a "cheater bar" was contrary to BNSF policy as it might damage the switch apparatus or cause some injury to those attempting to use the bar. Dixon and Smeltzer were able to get the switch to operate and moved it back and forth. Neither the Edgemont maintenance of way crew nor anyone participating in the 7:30 a.m. briefing was on site and aware of any of this at the time of the morning meeting. It was unclear from the testimony whether the test train passed through the switch before, during or shortly after the 7:30 a.m. morning call.

The August 5, 2020 Order stated: "Mr. Stirmel assigned Mr. Lessert to clean the Deadwood wye switch," Doc. 196 at 15. This excerpt improperly views the facts in the light most favorable to the moving party, the Plaintiff, rather than to the non-moving party BNSF. See True v.

Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (on summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party"). The August 5, 2020, Order later stated: "The court finds there is no genuine dispute that Mr. Stirmel assigned Mr. Lessert and his crew to clean the Deadwood wye switch." Doc. 196 at 18. But there was and still is a very genuine dispute of fact that Stirmel assigned Lessert and his crew to clean the switches of the Deadwood wye. These factual conclusions were integral to the grant of summary judgment that BNSF "violated § 214.315(a) by failing to provide a safety briefing during the 7:30 a.m. call where Mr. Stirmel assigned Mr. Lessert and his crew to foul a track." Doc. 196 at 32.

Three factors likely contributed to the court viewing the facts in the light most favorable to the movant Plaintiff and not most favorable to BNSF as the party opposing this motion for summary judgment. First, BNSF had filed its own motion for summary judgment, requiring the court to view facts in the light most favorable to Plaintiff in opposing BNSF's motion yet in the light most favorable to BNSF in opposing Plaintiff's motion. The August 5, 2020, Order properly noted that the magistrate judge "had applied an incorrect standard when she declined to draw inferences in favor of any party because of the cross-motions" for summary judgment. Doc. 196 at 3 n 3. Thus to some degree, the court had to view Stirmel's testimony about what Stirmel said during the morning call in the light most favorable to Plaintiff and in the light most favorable to BNSF to rule on the cross-motions for summary judgment. Second, Stirmel was inconsistent during his lengthy deposition testimony about what he said on the morning call about the test train. As a result, Stirmel testified at times in a way where a reader might infer he assigned the crew to foul the track, although Stirmel's testimony elsewhere would not support such an inference. Third, the parties submitted small excerpts of Stirmel's deposition testimony multiple times during the

5

pendency of the summary judgment motion, making it difficult to read Stirmel's testimony in its entire context. See Docs. 99-4; 111-9; 139-8; 188-8; 200-1.

The undersigned has had the benefit of reading the entire transcript of Stirmel's deposition testimony, Doc. 279-11, because the parties designated him to testify by deposition when they were unsure if Stirmel would voluntarily attend trial given that he no longer works for BNSF and lives outside of the subpoena authority of the District of South Dakota. Stirmel did testify live at trial, as did Rodney Huber, the Edgemont track inspector who was on the morning call. Huber described the morning call as including a roll call of who was on the line, a list of things to do, an opportunity for input from employees, and a general briefing not aimed at anticipating each time someone might foul a track during the day. Indeed, track inspectors foul the track multiple times throughout the day as part of their daily duties, as do maintenance of way personnel to a lesser extent. Huber had no criticism of how Stirmel handled the morning call. Huber recalled that on the January 17, 2017, morning call, Stirmel directed Lessert to find the trainmaster of the test train on the wye and find out what help he needed. Huber was uncertain if there was any mention of cleaning Deadwood wye switches, though he allowed for the possibility that there had been discussion of the need to clean switches generally. Cleaning switches is something regularly done by train crews and maintenance of way crews. Mitchell, the surviving member of this maintenance of way crew, testified that he had cleaned switches hundreds of times.

Stirmel had been asked repeatedly during his deposition about what assignment he made to Lessert and his crew during the morning conference call. Stirmel knew only that a test train crew was going to be on the wye that morning, testifying that he wanted "to have the guys work with them and to find out what help they were going to need. I did not know at 7:30 that anybody

6

was even out there or had even tried to throw [the switch.]" Doc. 279-11 at 7–8 (transcript pages 28–29). Stirmel added:

> I explained to them what was going on that morning and that, you know, they were going to try to do this. I told them I did not know which direction the train was coming in, which direction the train was going out, how far they were. I had no idea exactly what they were planning on doing. So I did not know which one of the two main line switches they were going to need, or which—if they were going to have to clean the junction switch where the east and west leg come together there's—out of those three switches, that was up to—between their communication with the trainmaster to figure out what needed to be done.

Doc. 279-11 at 8–9 (transcript pages 32–33). Stirmel testified that the gist of his direction to Lessert was to contact the trainmaster of the test train and see what help that group needed. Doc. 279-11 at 16, 27, 28–29, 32–33, 113. Stirmel did mention switches in his testimony and at times that cleaning switches could be part of what was needed.[3] Doc. 279-11 at 16, 32–33, 52. But Stirmel's testimony consistently was that Lessert should check with the trainmaster of the test train to see what support was needed from the maintenance of way crew, and there is no evidence that Stirmel mentioned the west wye switch specifically during the morning call. Stirmel did not give a safety briefing during the 7:30 a.m. call, explaining that he was 60 miles as the crow flies away, conditions at the scene of the work dictate what safety briefing and on-track plan should be selected, Lessert was the foreman and thus employee in charge to give the on-site safety briefing, and Stirmel was unaware of what work the test train crew might need from the Edgemont maintenance of way crew. Doc. 279-11 at 44, 54–56, 60–61, 105–07, 109, 113. Stirmel's testimony at trial was similar to his deposition testimony; he did not recall saying anything about

---

[3] As mentioned earlier, members of the train crew will clean switches too, which is in fact what Dixon and Smeltzer did at the west switch of the Deadwood wye before Lessert's crew met up with the train crew on January 17, 2017.

7

cleaning switches but acknowledged that he might have, though the thrust of his direction to Lessert was to meet with the trainmaster and determine from him what work needed to be done.

Lessert's conduct indicates that he understood his assignment to be to meet with the trainmaster to provide whatever assistance the test train crew needed. Lessert did not go directly to any switch location but found division trainmaster James Korecky on the wye. Korecky and others had been working to clear a crossing on the wye, and Lessert and Korecky spoke as the two of them waited for Mitchell to come from Edgemont with a front-end loader to the crossing to clear snow. During the conversation, Korecky and Lessert spoke of the joy of railroad work in January in South Dakota and Korecky mentioned in passing that the train crew had trouble with the west wye switch but had gotten it to work and had operated it back and forth. Korecky did not directly assign Lessert to work on the west wye switch, and Korecky did not remember Lessert saying anything in response to what Korecky said about the switch. Lessert, Schmitz, and Mitchell helped clean not only the crossing but also between some of the railcars, completing what support the trainmaster of the test train sought from the maintenance of way crew on the wye.

After Lessert's crew had helped clear the crossing on the wye, Mitchell drove the front-end loader back to the Edgemont section house, where he was later joined by Lessert and Schmitz. Mitchell testified that he wanted to move a concrete parking barrier back to its proper location because he earlier had displaced it while cleaning snow from a parking area, but Lessert wanted to take Mitchell and Schmitz to check on the operation of the west wye switch. There was nothing at all wrong with Lessert wanting to check on the condition of the west wye switch having learned that the train crew had struggled to throw the switch earlier and perhaps learning of the unusual means by which the switch was forced to work.

8

Mitchell's testimony was that the three of them went in their work pickup to the west wye switch with Lessert driving and Schmitz in the front passenger seat. All that Mitchell recalls of discussion in the pickup was that Schmitz said "I guess I'll fill out one of these" as he took the Statement of On-Track Safety form BNSF required to be reviewed and completed when lookout is the form of on-track safety. Schmitz filled out the form and put it in his pocket; the form shows Schmitz as the one who prepared it, lists the place and time of completion, designates the pickup as the "place of safety," noted that the form of warning was verbal, and checks a box indicating that at a maximum track speed of 35 miles per hour, the distance the train would be away with 15 seconds to spare would be 770 feet. When lookout protection is used, employees are to be at the designated place of safety 15 seconds before a train or other equipment on the track arrives. According to BNSF, Lessert as foreman and therefore employee in charge of the crew was responsible for the on-site safety briefing. See 49 C.F.R. § 214.315(d). However, Mitchell said that Lessert and Schmitz had switched roles, which BNSF disputes. Plaintiff believes that Schmitz became the railway worker in charge when Schmitz filled out the Statement of On-Track Safety and undertook the lookout role.

Lessert parked the pickup safely about 50 yards from the switch. When the three of them got out of the pickup, Lessert grabbed the shoulder-mounted blower and Mitchell took one shovel and handed the other shovel to Schmitz. Mitchell recognized after handing the shovel to Schmitz that Schmitz was the lookout and said, "you don't need one." Schmitz responded, "take turns" to which Mitchell replied, "just look out." All three walked to the switch, and Schmitz started the blower for Lessert. Mitchell said that Schmitz was the lookout and that he was relying on Schmitz as the lookout. Mitchell was knocking ice and snow from the end of railroad ties near the box of the switch for Lessert to blow snow from the tracks through the rails and away.

9

Cameras on the front and back of a passing train on an adjacent track[4] with cars full of coal recorded that the pickup was parked sometime between when the front locomotive passed the switch and when the locomotive at the rear of the train passed. As the rear camera on the passing train cleared the switch, a train containing empty cars from the opposite direction was approaching on adjacent tracks. As this second "striking train" rounded a bend and passed by the back end of the first train, the camera mounted on front of the striking train's locomotive recorded Lessert with a blower on his back and Schmitz with a shovel in his hand between the rails on the tracks on which the train was approaching while Mitchell was just off the track. Although the train blew its horn, all three men appear to have their backs or sides turned toward the oncoming train until they disappear from view of the camera. Mitchell believed that they had been on the track for just 15 to 30 seconds when the train struck and killed Lessert and Schmitz. Mitchell did not see or hear the train approaching, and the camera video does not suggest that Lessert saw or heard the train coming. The sound of the blower on Lessert's back and the other train having just passed likely made a verbal warning unworkable.

The entry of partial summary judgment deeming BNSF to have violated § 215.315(a) as a matter of law by Stirmel not giving the safety briefing during the 7:30 a.m. call is a decision that adjudicates one of several issues in this case; it is not a final judgment. Under Rule 54(b) of the Federal Rules of Civil Procedure:

> any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

---

[4] A double set of tracks exist in the area; there are two sets of tracks so that a train going railroad west can pass a train going railroad east.

Fed. R. Civ. P. 54(b). Partial summary judgment orders may be reconsidered and revised up to the time a final judgment enters. Hoffmeyer v. Porter, 2013 WL 2898171 at *1 (E.D. Mo. 2013); Unum Life Ins. Co. V. JLH, 486 F. Supp. 2d 864, 865-66 (E.D. Ark. 2007); Northwest Airlines, Inc. v. Astraea Aviation Serv's., Inc., 930 F. Supp. 1317, 1323 (D. Minn. 1996). As discussed above, the grant of partial summary judgment to Plaintiff on one of Plaintiff's claims improperly relied on viewing the facts in the light most favorable to Plaintiff. The question of whether Stirmel assigned Lessert and his crew to foul the main track was a disputed question of fact at the time of the cross-motions for summary judgment, which became apparent during trial.

Second, the partial summary judgment decision's discussion of "Mr. Lessert and the § 214.315(a) safety briefing" resolves disputed facts in favor of the non-moving party in stating: "As a factual matter, there is no support for the idea that Mr. Lessert assigned himself to clean the switch. Mr. Stirmel assigned the task." Doc. 196 at 31. Actually Lessert decided to check on and clean the west wye switch not as a result of what Stirmel said, but after hearing from Korecky that the train crew had difficulty getting the west wye switch to work earlier that morning, though Korecky added that they had cleaned it and worked it back and forth. Understandably Lessert wanted to check on the condition of the west wye switch after talking with Korecky. But it is a question of fact not proper to resolve on summary judgment whether that work was assigned to Lessert or the result of Lessert deciding in his discretion as a foreman to assign himself and his crew to clean the switch. That is, there was a genuine issue of fact of whether Lessert, as foreman and the employee in charge of the Edgemont maintenance of way crew, assigned the duty to his crew and thus was the representative of the "employer" to conduct the § 214.315(a) safety briefing as well as the one to conduct the on-site safety briefing under § 214.315(d). Indeed, the FRA Guidance discussing § 214.315 contemplates situations where the 315(d) briefing on site "might

also fulfill the requirements of paragraph (a) of this section." Roadway Worker Protection, 61 Fed. Reg. 65,959 (Dec. 16,1996).

Therefore, to facilitate settlement of the case and for good cause, it is

ORDERED that the joint motion to vacate the August 5, 2020, Order is granted to the extent that this Court vacates the prior entry of partial summary judgment for Plaintiff on the claim that Defendant violated § 214.315(a) as a matter of law.

DATED this 20th day of April, 2022.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE